Good morning, Your Honors. My name is Larry English, and I represent the appellant Sharon Lewis. This is a simple case. Did a reasonable, would a reasonable jury, after listening to Coach Brian Kelly testify, under direct exam and under cross-examination, quote, I clearly understood that Sharon Lewis' situation was one to the point where I would not have been able to testify if I hadn't had a reasonable jury. And that was to be handled by our senior administration and the university. That was not my purview. The Fifth Circuit has consistently hailed that a jury cannot reach a verdict based on speculation. And I ciphered the court several cases. Montgomery Ward v. Sewell, 205, Fed 3rd, 6463, 1953. Center Chemical Company v. Arville, 392, Federal 2nd, 289. And recently, Johnson, I'm going to exclude his name, v. Ferrell-Logalis, 96, F-4, 852, 2024. I thought your claim wasn't so much speculation, that it was at the trial, six-day trial, which I did try to read.  There was evidence that Kelly had come in, really didn't know Lewis at all, hadn't met her, correct me if I'm wrong. That's correct, Your Honor. And he wants to start new. So they have a story. I thought your argument was, though, the evidence you just cited, that it wasn't even within his purview, contradicted the only story they were given. Your Honor, you are correct. Your Honor, the only story that they were given was that Brian Kelly, he eliminated her position. A position is not a person. A position is a placeholder. As the Court has just realigned, Coach Kelly was coming in. He had nothing to do. He had just arrived. He testified that I was told to leave Sharon Lewis' office alone. I couldn't even go into her office. I didn't know who she was. I didn't have anything to do with it. And under direct examination and cross-examination, he testified that I did not terminate Sharon Lewis. The appellee is arguing, and where the speculation comes in, Your Honor, is the appellee is arguing is that, and the district court agreed with him, by the way, that there were multiple witnesses who testified that Sharon Lewis, that Coach Kelly terminated Sharon Lewis' position. So where I raise the question of speculation of it is, in order for a jury to have ignored Coach Kelly's testimony, it would have speculated that Coach Kelly terminated Sharon Lewis when none of the witnesses, and we used the appellee's record excerpts in support, because they list all of this testimony. None of those witnesses testified that they were aware of that Coach Kelly terminated Sharon Lewis. They all argued, they all speculated, Your Honor, that Coach Kelly terminated Sharon Lewis because he terminated her position. But we just didn't stop there. We presented in front of the jury the Hush Blackwell report. That was LSU's lawyers. The Hush Blackwell report documented that LSU has systemically failed to apply and follow federal Title IX law. That report also documented that Sharon Lewis was the only person in the whole university that had ever reported Title IX violations but was subject to a PM3 investigation. The president of the university, after this report was released, he came out and he testified and apologized to Sharon Lewis and the whole community for LSU's failure to follow Title IX law. But that's not the only evidence that the jury had in front of them. The jury had in front of them, we put in front of the jury that there was a discriminatory policy in place, that LSU was protecting coaches who had been accused of sexual harassment. The Hush Blackwell report documented that in 2012 and 2013, two students filed complaints against Les Miles, of which Sharon Lewis reported to LSU that those students, that he had sexually harassed them and sexually assaulted them, those reports were buried in LSU's law firm, Taylor Porter's law office for eight years. We put evidence in front of the jury that as recently as 2021, that even though Taylor Porter had buried that report, they were still representing LSU. Am I right there? Defense, though, was very narrow, which was there's a horrible amount of material from the past. But that's the distant past. And it's a different set of defendants. It's Miles, it's the rest. As to the termination decision, this is what I remember the jury was told, you would basically have to find that 39 people, other people, were fired for legitimate reasons, but your client was stuck in there for an illegitimate. Is that a fair characterization? That's what their arguments are, Your Honor.  Your Honor, but Sharon, when Frank Wilson, who was hired, and by the way, Your Honor. But no reasonable juror could agree with that, that it's implausible, that in other words, when Kelly comes in, he doesn't know her at all. He may have said, he did say, you elicited it, that it's not within his purview to focus on her. But that doesn't necessarily contradict that he wanted to have a fresh start, his own team. Your Honor, he testified. Your Honor, I don't know how to address this. Your Honor, I practiced criminal law for 40 years. I don't know how to address. Your burden is to show no reasonable juror could accept that she was in with 39 others because they wanted a fresh start under Kelly's team. Your Honor, if you were just looking at this case just in isolation, and none of the background and none of the information that we're talking about in the Husch-Blackwell report ever happened, I guess you could make that leap and say that a reasonable jury would ignore Kelly's testimony under oath and cross-examination, but that's not what happened in this case. I'm sorry. The report got in and the jury was... The report was placed into evidence, Your Honor. Yes. Okay? And also, Your Honor, there was a background report. Frank Wilson, Sharon Lewis reported that Frank Wilson was assisting Les Miles in sexualizing students. When they got ready to hire Frank Wilson in the background report, that allegation was in the background report. But also what was in that background report, Sharon Lewis was still an employee at LSU and they listed her as a former employee in the background report. Now, after all of this scandal happened, Your Honor, after all of this went national, all of this went in, to answer your question, Your Honor, they went out and hired Husch-Blackwell to go out and do this report. LSU then revised their Title IX policies. The State of Louisiana required them to revise their Title IX policies and they put in place new policies that said that if you fail to report a Title IX violation, it will lead to your termination. So when they had the background report and this new policy was in place, the Human Resources Office failed to turn this over to the Title IX complaint. The LSU General Counsel's Office failed to follow this over to the Title IX coordinator. Also, Your Honor, we argued, and it was evidence that was put in front of the jury, that there was a discriminatory policy in place to protect the coaches. It was testified under oath that Winston DeQueer, LSU's General Counsel, directed the former Title IX coordinator not to report the allegations of sexual misconduct against coaches to the Title IX office as required by federal law. You're going to have a strong answer, I'm sure. Yes. Just to clarify, what does the failure to transfer the reports have to do with her termination? Your Honor, it goes to that there was this systemic failure. The Hutch Blackwell Report documented that there was this systemic failure to, first of all, to follow Title IX law and to retaliate against people who reported Title IX investigations. So there was this pattern and practice in place that LSU had in place where they were not reporting Title IX investigations to coaches. Sharon Lewis worked in the Athletic Department. There's nothing that Kelly was involved in that. So the argument depends on we've got to put the Kelly evidence that he wanted to start fresh. We've knocked that out because he said he didn't. Is that it? That's how the two align? Your Honor, we didn't raise it in our brief because, you know, jury notification is a big issue and we didn't feel that we wanted to go there. But essentially, Your Honor, what the appellees put in front of the jury was, don't believe Brian Kelly. Don't believe what's coming out of Brian Kelly's mouth. Don't believe the Hutch Blackwell Report. Don't believe all of this testimony that's in front of you that we have failed to follow our Title IX regulations. You need to believe that Brian Kelly terminated Sharon Lewis's position and, therefore, he terminated Sharon Lewis. That's speculation, Your Honor. You're asking the jury. Yes, Your Honor. The athletic director actually signed the termination letters for all of these, didn't he? Yes, Your Honor. But he testified under oath that, did you speak to Brian Kelly and did Brian Kelly tell you to terminate Sharon Lewis? He said, no, I did not. He said, I relied. Brian Kelly told him, I want to clean out that department. And so why couldn't the jury assume that the AD was doing what the coach contract allowed him to do and he terminated him to accommodate Kelly? Because Kelly testified to the jury that when he first got to LSU, he was walking through the athletic department and he saw an office to the side. And that office, and he says, I want to put my chief person in this office. And he was told, that's Sharon Lewis's office. You can't have anything to do with that office. Leave that alone. He was told under no circumstances are you to touch Sharon Lewis. The jury can't just, with all due respect, Your Honor, the jury just cannot disregard the principal witness. Their whole case relied upon Brian Kelly saying he terminated Sharon Lewis. But then he testifies under direct exam. He testifies under cross-examination. Listen, this wasn't some, well, I think they told me to leave him alone. I got the impression that they told me to leave Sharon Lewis alone. He testified specifically, I was told under no circumstances was I to touch Sharon Lewis. When the appellee had him on direct exam, she asked him, Your Honor, did you terminate Sharon Lewis? He said, I terminated Sharon Lewis's position. That's all I did. The jury was listening to Kelly and it was clear that Kelly was telling the jury, I did not terminate Sharon Lewis. So as a matter of law, Your Honor, this was not a criminal case. We weren't required to put on beyond a reasonable doubt that based off of the evidence that Sharon Lewis was terminated because she was retaliated under the civil law, it was more likely than not. So, Your Honor, as we prepare for this case, as we sit here and listen, what else would a court require Sharon Lewis to do? The chief witness said, I didn't fire you. You put on the employer's own report by their lawyers by saying that we institutionally failed to follow Title IX law. In that report, it documented the whole history of Sharon Lewis at LSU, that she had repeatedly reported these violations of sexual harassment by the coaches and she was retaliated against. You had the LSU general counsel's office who was telling the Title IX coordinator, leave all of the complaints of sexual harassment in the athletic office. You have all of this evidence, Your Honor, showing that Sharon Lewis reported Title IX. She was retaliated against. She reported Frank Wilson. They came back and said after all of this hit the fan, they went before the public and said we are putting new policies in place. It's not mandatory. It is not mandatory. Before your time elapses, you do have rebuttal, but what would be your best case where a court of appeals reverses a jury verdict on the theory no reasonable juror could believe the story of the clean slate, start fresh, because one set of testimony necessarily undermines the other? What's your strongest case where we would do what you're asking us to do? Your Honor, I spent hours researching, looking for that issue. You did. And the reason why I didn't find that issue, Your Honor, is that if a jury is hearing the chief witness say I didn't do this, I didn't do what they said I do, no reasonable jury other than this jury I suspect would have believed that question. Your Honor, let's just listen to the previous arguments. I heard the questions. You're dancing on this. You're dancing on this. I was told in no uncertain circumstances to leave Sharon Lewis alone. Did you cross-examine? We cross-examined. Did you? No, I didn't. No, my co-counsel did, but my distinguished colleague here, she put him under direct exam. But I'm guessing on cross your colleague specifically said how in the world do you explain this statement of yours? And what was his reminder? Your Honor, if you go back and read the transcript, he danced a little. Okay. And my co-counsel pulled out his deposition. And my co-counsel said, did you state this in your deposition? And he read it to him. He says, now, are you changing your opinion? He said, no, I am not. Okay. You can stop on that. Thank you, Your Honor. Well, here, it's Ms. Furr. Was cross-examination that devastating of Mr. Kelly on your theory of the case? No, it was not devastating at all. And we also never said to the jury, do not believe anything Brian Kelly says, just to clarify a misstatement there. I'll just start with the intro. Good morning, Your Honors. I'm Susan Furr on behalf of the LSU Board of Supervisors. As you pointed out, Ms. Lewis cannot escape the glaring fact that she was terminated with 39 other people upon a change in the head football coach at LSU. And despite this mass staffing turnover, Ms. Lewis argues that under no circumstances could the jury have determined that she was terminated for sweeping changes in the department, even though that is the most logical conclusion that the jury could have reached. I'd like to begin with how the jury could reasonably reach its verdict, and then I'd like to turn to the evidence and the insufficiency of the evidence to overturn that verdict. The elemented issue for the retaliation claim is causation. The parties agree on that. And the burden is that Ms. Lewis must prove that but for her Title IX and Title VII activity, she would not have been terminated in the staffing turnover. The evidence that the jury heard supported their verdict without question. Just some examples of what the jury heard were the statistics. We've already mentioned them. The fact that Ms. Lewis was one of 40 people who were terminated. That alone suggested to the jury that she was not singled out and terminated for retaliation. Another important statistic is what Ms. Lewis argues on appeal herself, which is that she was the only one of the 40 people who had filed an EEOC charge. That actually helps our case and hurts Ms. Lewis's claim. If 39 people were terminated who did not file a Title VII or a Title IX claim, then it makes sense that the Title VII or Title IX claims had nothing to do with Ms. Lewis's termination. How do you respond to the argument on the other side that Mr. Kelly was told to leave Ms. Lewis alone? I can respond with Mr. Kelly's direct testimony that the jury heard, which was he was questioned, did anyone give you any instruction that you could or could not terminate Ms. Lewis's position? Answer, no, never. Did anyone talk to you about terminating Ms. Lewis specifically? No, never. So the difficulty for the jury, they had to accept the distinction between person and position, that he admits he can't end the person's career, but he can end the person's career if he ends her position. He didn't testify that he could not have ended her career. He simply explained what his decision was based on, and this is the testimony that the jury heard, where he explained why he draws the distinction between terminating a position and terminating employment. And I asked him squarely, who made the decision to terminate the position that Ms. Lewis occupied? And he said, I did. Did you make a targeted decision to terminate her personally, or did you just look at the position? His response was, no, this was simply about organization structure and putting together the organizational structure that I sought fit for LSU and what I wanted to do to bring back a championship program. So he explains, in his mind, he was drinking from a fire hose, he testifies how he came into this program, he had to make quick decisions, and he was instilling an organizational structure that was similar to an organizational structure he had done in other places. Okay, so then my next thought is, was there any employee that was previously there that wasn't fired, one, and was there any preexisting position that wasn't done away with? If his argument is, oh, I couldn't touch the person, but I could the position, is that consistent? There were no preexisting positions that were left afterwards, no preexisting employees? It was truly clean-sleuthing. I believe there was testimony at trial that there were two people who were, his testimony was that they were at the lower rungs of the recruiting department who had just come in, and I think his testimony was, you want people who are new, who don't have the bad habits that he's supposed to be coming in to replace. And so I think there was that, and I think there's testimony about Yael Loftin, who was the administrative assistant to the head football coach, but she's not part of the football operations, she was an administrative assistant. And to my knowledge, that's all the testimony showed. If there were others, I'm unaware of them. So the jury heard these statistics. The jury also heard the testimony. As I've just mentioned, Brian Kelly testified very definitively that he was the person who made the decision to terminate the position. He testified about sweeping reductions he made. He testified about the fact that he wanted to build his own staff, and, in fact, he brought in someone that he had worked with in the past to perform some of the recruiting function that Ms. Lewis had performed, which in and of itself is a legitimate non-retaliatory reason for Ms. Lewis being moved out. He testified he terminated her position as well as dozens of others. He testified that the terminations occurred across departments, not just in Ms. Lewis's department, and he testified that within her department there were a number of people who were terminated, not just Ms. Lewis. And not only Brian Kelly testified to this, other witnesses testified as well. They supported his testimony that he made the termination decision, that the terminations were sweeping, that these changes are common in the industry. This happens all the time with football coaches at his level, and, in fact, he had done the same thing many times before. And he testified that many were affected. She was not singled out. In her brief, Ms. Lewis states specifically, it is not in dispute that Kelly had the authority to and did terminate numerous employees. She also states it is not in dispute that Kelly and multiple witnesses testified that Kelly terminated appellant's position. And that is, in fact, the case, and that is what the jury heard. The testimony showed he made the decision and that she was not singled out in any way. Also supporting the jury's verdict is the absence of testimony. At trial, not one witness came forward to dispute Brian Kelly's description of the termination and the decisions that he made and the basis for those decisions. Her only two witnesses that she brought forward had been gone from LSU for six years, so they didn't have any information about her termination. She introduced no retaliatory comments that were ever made by Brian Kelly to even suggest that he possessed retaliatory motive for doing away with her position. And then fatal to the causation element is the fact that no one testified that Brian Kelly even knew of the Title IX or Title VII activity that she allegedly engaged in. Without him having this knowledge, and she doesn't argue this on appeal either, that Brian Kelly possessed any knowledge of her Title IX or Title VII activity. And without that knowledge, he could not have retaliated against her. So the jury heard . . . The late director that wrote the termination letter, he had been there during all this, the horrors? He had not. He had not either? He came during the Hush Blackwell time period, but he was not there at all during the Les Miles period that was the main subject of . . . Your position today is the same one that was the closing, which is assume all the horrors under Les Miles. Assume all of that. Assume all the Title IX deficiencies. When Brian Kelly comes in, it's a clean sweep. Yes. And that's the argument that the jury . . . And Scott Woodward was there. I mean, what counsel is going to argue is Scott Woodward was there when she filed an EEOC charge, and he will say he was aware of the EEOC charge. But just to clarify something, Scott Woodward did not write the termination letter. It was presented to him, and he signed the termination letter, along with the termination letters for all of the other staff that was being let go. So there's no connection at all to the fact that Scott Woodward signed the termination letter and the termination decision. At what point did Kelly become aware of the history between Ms. Lewis and Wilson? He testified that that was after she was terminated. It was, in fact, Ms. Lewis, and this isn't really public. I guess it's in the record, maybe in the district court. But Ms. Lewis did not even add Frank Wilson to the lawsuit until after she had been terminated. So he testified it was after that all hit in the media that he became . . . They were hiring Wilson. That was never discussed. Sharon Lewis's allegations against Frank Wilson were never discussed with Brian Kelly before he made the decision. Well, afterwards, though. I don't know if he testified about how he learned about it afterwards, but he said he learned about it sometime after she had been terminated, and there wasn't any conflicting evidence on that. Despite all of this information that the jury heard that demonstrated that she was terminated for these staffing changes, Ms. Lewis still consistently disregards the evidence, and that's what the district court found as well. They said that Ms. Lewis does not reckon with the evidence against her. Instead, she cites only the evidence she believes favors her and insists that it entitles her to a new trial. It's the same thing that's happening on appeal. Let me ask you this. His statement in his deposition that he was told clearly to leave Lewis alone, that wouldn't have implied that he knew about the Frank Wilson problem? There wasn't any suggestion that he knew about the Frank Wilson problem. What was suggested as the reason? He was talking about the fact that he was walking through, as Mr. English alluded to, the fact that they were walking through, he wanted to put his assistant, or chief of operations, in the office that Ms. Lewis had occupied. Ms. Lewis had been on leave for a year, so she was not there at the time, and he said, I'd like this office, and they said, you can't do anything with this office. But again, he testified that he was never told he could not terminate her position at all, or that he was told he could not terminate her employment. That is not a statement that was made anywhere, and at the very worst, even if that gives you some concern, that's a credibility issue. That's information that was presented to the jury. They listened to his testimony. As you might imagine, Mr. English and his team were very committed to this argument, argued it before the jury in the closing and the cross-examination and everything, and the jury made its decision. It assessed the credibility and decided apparently to believe Brian Kelly. So turning to her evidence and the reason it doesn't override the jury's verdict, this appeal, as you heard, is just about disagreement with the jury's verdict. It's not any underlined evidentiary issues or anything like that. It's just that he wants a different result. Ms. Lewis has acknowledged in her briefs the great deference afforded to a jury's verdict. She acknowledges that her burdens in overturning this verdict are very high, and she cites the burdens throughout her brief. She cites the Johnston v. Ferrell-Gass case where I believe you, Judge Higginson, were vocal about your feelings about emphasizing the high burden of overturning a jury verdict, and she cites the Foridori position in which Judge Davis, you joined in the opinion, also emphasizing the high burden of overturning a jury's verdict. She acknowledges that all reasonable inferences are supposed to be drawn in favor of the non-moving party. She acknowledges that even in the face of conflicting evidence, the court is not free to re-weigh the evidence or to re-evaluate the credibility of the witnesses. The court can't substitute its own inferences for the jury's reasonable factual inferences, and it must disregard all evidence favorable to the moving party that the jury is not required to believe. No one's objecting to the jury instructions but for causation? Not at all. Correct. How long was the jury out? Three hours maybe? No jury questions? No. Yes, there was one jury question. I don't recall what it was, though. Contrary to these rules, what she's asking for here is she's asking for inferences to be drawn in her favor. She's asking for credibility to be assessed, Brian Kelly's credibility, and the witnesses, Scott Woodward, who testified that he had nothing to do with making this decision. And despite being the moving party, she's seeking for her conflicting evidence and her inferences to predominate, and that's just not the standard for overturning a jury's verdict. So we talked about the Brian Kelly issue. So essentially she's saying it's nonsensical for Brian Kelly to draw a distinction and say that he, for us to say that he terminated her employment when she actually, he only terminated her position. But that seems to suggest that somehow if someone terminates a position, it doesn't necessarily or typically lead to terminating their employment. What the jury heard was the jury heard that 40 people's employment positions were terminated and that 40 people's employment was terminated. It would be absurd to suggest that the jury could not have concluded that by eliminating her position, her employment also terminated. Again, I emphasize. If the facts had just been she was fired, would that, would, could the verdict stand if he had acknowledged that he'd said I can't fire her, turned around, eliminated her position? Would that still be up to a jury? Yes, but I'm challenged that he didn't say I was not able to terminate her. He said I had authority to make whatever changes I wanted to make. He said he was told that Sharon Lewis' office issue was within his purview, but he also testified that he was giving free reign to make whatever employment decisions he needed to make, and no one told him he could not have terminated Sharon Lewis individually if he had wanted to make that decision. Okay, clarify that a little in the deposition. Not within my purview to fire her? That's not correct. I don't believe it said not within my position to fire her at all. No, it said she was not within my purview, as I believe what the testimony was. Okay. Yes. I can find the specific language if you need the specific language. Okay. More importantly, I'm not even sure why this is such a big issue for Mr. English because, honestly, he has the burden. So even if he debunks Brian Kelly's testimony and says that Brian Kelly did not terminate her employment, he had the burden of telling the jury then who did, and then showing the jury that that person possessed retaliatory motive. It's not enough to simply say our defense doesn't work. He had the burden of proof at trial to show the jury who terminated her and what the basis of finding retaliatory motive for that person was, and there was absolutely nothing. So to call it speculation, as he does, is focusing on our defense. It's not focusing on his burden. How long was Wilson back in Wilson, the man who was alleged to have done horrendous things to her? Yes. How long was he back before she gets fired? He was hired in December. She was still on leave, mind you, so they were not in the same building, but he was hired in December and she was terminated in January with 40 other people. Well, I guess technically Woodward is the one who signed the termination letters, right?  I mean, Kelly was an incoming coach, but he didn't have the administrative power or authority to actually do the terminating. That was up to Woodward, I assume, on his order. He had the authority to make the decisions of who he wanted gone, and then it was executed by the staff in the athletic department who was existing, yes. What's the explanation for Coach Kelly's insistence that he wasn't going to terminate her, he was going to terminate the position? Why would he make that big difference? He makes, from what he testified at trial, he explained that he makes that difference because he wanted to be clear that he did not come in, he didn't know Sharon Lewis, as Mr. English just explained, he didn't know Sharon Lewis, he did not ever say, I'm going after Sharon Lewis, let's look at her and let me get rid of her. He looked at the structure, he looked at the positions, and he made the decisions, irrespective of who was occupying those decisions. And that's his reason for saying that, because he's distancing himself from the idea that he was looking at Sharon Lewis personally and saying, I want her to go. He was saying, I don't have time, I didn't know all these people, I looked at the structure and I said, I want my person, who I know, to come in and take a role with recruiting. I would assume that's true of all the people in the department. That's exactly right. He said that. That's what he did for everybody. He did not look at the people, he looked at the positions. Who handles now the tasks and responsibilities that Ms. Lewis had? I don't know who's currently doing it. How is the structure different now than it was then? I don't know what's currently happening. It's my understanding that somebody he worked with before when he was coaching at Notre Dame came in to perform on-campus recruiting duties. I don't think the scope of the job was the same as the scope was under Ms. Lewis, and I don't think the title was the same. So anyway, this issue, to me, I don't even understand why it helps his argument because he still has not shown who made the decision and any retaliatory motive. Quickly, regarding Title IX evidence, he says the jury could have only concluded that she was terminated for Title IX retaliation, and he focuses solely on what others knew because, again, he has not argued that Coach Kelly had any knowledge of her Title IX or Title VII activity. He argues about various people. He went through all of them, but his brief, Tate and Collins and all sorts of people, not one of whom has ever been tied to the termination decision. He lacks knowledge. Do you agree that if the person who replaced Ms. Lewis came in with the same title and the same scope and the same job description, that it would be more difficult to prove pretext? Be more difficult to prove pretext. You mean to disprove pretext? I just think those are different facts. Certainly it would change. You said you didn't understand what difference it would make. No, what I'm saying is I don't understand what difference it makes for him to make this argument about, like, even if he debunks, even if you come in and you say Brian Kelly was wrong, he terminated her employment versus terminating her position, he has to show he didn't emphasize throughout his briefs that Brian Kelly did not make this decision. So then it just begs the question of, well, then who did? Like, if you're going to distance Brian Kelly from the decision, I mean, he says Brian Kelly's testimony was unimpeached, that he didn't make the decision. Well, if that's so, then who did make the decision? And that is his burden to have shown the jury. And he hasn't come forward on appeal to say, he said maybe Woodward because Woodward signed a letter. But then there's still no evidence of any retaliatory motive by Woodward. So it's all, it crumbles. If you don't say Brian Kelly terminated her, either way it crumbles, honestly. Woodward had notice, didn't he, of the Title IX complaint and the EEOC complaint? I'm sorry? Woodward had notice of the EEOC complaint and the Title IX complaint, did he not? No, there's been, she has not argued that Woodward had any notice of the Title IX complaint. The only thing she said was that he had notice of the EEOC complaint. But she has to link that to something. I mean, simply because that's just the knowledge of the protected activity. You then have to show that there was, that he actually took an adverse employment action, which he didn't. But then you have to show, like, that he did so for retaliatory reasons. And the reasons here, if nothing else, show the testimony is perfectly clear, that Brian Kelly said he wanted to terminate this position and Scott Woodward signed the letter. So there's no motive or anything that could be even attributed to Scott Woodward in that scenario. I think I'm running out of time. At the end of the day, Ms. Lewis bears the ultimate burden of proving that the jury could never have found that she was terminated as a result of the non-retaliatory staffing turnover that occurred to all the others in the football department. Even though this is the reason it's the most logical conclusion that the jury could have reached, she somehow says the jury couldn't have reached that conclusion. The jury heard all of this evidence. Nothing new has been presented. She's asking here to ignore the sanctity of the jury's verdict, and we ask that this court uphold the jury's verdict and affirm the district court's decision to also uphold the verdict. Thank you, counsel. Thank you. All right, Mr. English. Sharon Lewis argued to the jury over and over again that she sought to meet with Scott Woodward to report to Scott Woodward that Scott Woodward was retaliating against her. He refused to meet with her. Scott Woodward testified under oath that he refused to meet with Sharon Lewis. Scott Woodward testified, if you pull the EEOC complaint, Sharon Lewis stated in her EEOC complaint that I continued to want to meet with Scott Woodward and that Scott Woodward would not report to me. Scott Woodward's number two at the time, Virge Osbury. Sharon Lewis testified, and it's not in dispute, that Virge Osbury told her, you will never be promoted because you use Title IX too much. Scott Woodward terminated Sharon Lewis. We argued in front of the jury that Scott Woodward terminated Sharon Lewis. He signed the termination letter to suggest that Brian Kelly was making, you know, Brian Kelly simply said, I guess out of Shakespeare, somebody rid me of this priest. Scott Woodward and them said somebody rid me of this priest, and the priest ends up dead, and the king didn't make the order. Scott Woodward was the one who terminated Sharon Lewis. It is throughout the record, throughout the evidence that was put in front of the jury, we asked the court to look at the EEOC complaint. Sharon Lewis specifically stated in the EEOC complaint that she wanted to meet with Scott Woodward. He wouldn't meet with her. Scott Woodward, number two, Virge Osbury. Just to interrupt. Sure. Other than the employees that she mentioned, were there other employees that weren't hired by Kelly that remained? Yes, Your Honor. There were three employees, I believe, in the record that Brian Kelly did not terminate. As to terminating the position, Sharon Lewis was the recruiter. She was the on-campus recruiter. He didn't terminate Sharon Lewis's position. They have an on-campus recruiter right now. They just changed the name to another person, and that person is working at LSU right now. You could not eliminate Sharon Lewis's position because she was a part of the recruitment team. This is the reason why we focused on Brian Kelly's testimony is, with all due respect to my colleague, is because they're relying on Brian Kelly. They're saying that Brian Kelly terminated Sharon Lewis's position, but he didn't terminate Sharon Lewis. There is no reading under Brian Kelly's testimony that Brian Kelly had authority to fire Sharon Lewis. He was told that was not under my purview. I take you back to my original argument I made to you, Your Honor. In order for the jury to have concluded that Brian Kelly terminated Sharon Lewis's position, therefore he terminated Sharon Lewis, that's speculation and conjecture. This court, there is a high bar for this court to overturn a jury's verdict. But this court has consistently stated that we will overturn a jury's verdict if it's based upon conjecture and speculation. The jury would have had to believe, the jury would have had to say, well, he terminated her position, even though he's telling me I was told to leave her alone. Therefore, I'm going to speculate and through conjecture reach the conclusion that he terminated her. This court has consistently held and have overturned jury verdicts that have done exactly that. We draw the court's attention to the record. Would the jury have to have felt to get at her with the retaliatory motive, 39 other innocent people were fired? Your Honor. Would they have to have come to that conclusion or can you recommend? Your Honor, ask me that question one more time. Under your theory, would the jury have to have felt that Brian Kelly, new coach, sacrificed 39 other people to be able to get at one? I think the fact that Brian Kelly fired 39 other people is irrelevant to this issue. They were done for legitimate cleaning house. I don't know, Your Honor. I have no idea whether or not they were fired. Go on with your argument. All I know, Your Honor, is Scott Woodward, the athletic director, who terminated Sharon Lewis, told Brian Kelly, leave Sharon Lewis alone. We will handle Sharon Lewis. As to why Brian Kelly fired the other 39 people, as to whether or not that was, so what? I couldn't fire her. We ask that the court, given that the jury had to reach this speculation, we ask that the court reverse this jury's verdict and that they find in favor of the appellant. Thank you, Your Honor. Thank you both, counsel. That concludes the cases for the day and for this session. The court is in recess.